**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| **UNITED FOUNDRY CO., INC.,** | : | Bankruptcy No. 05-73035 BM |
| | : | |
| | : | |
| **Debtor** | : | Chapter 11 |
| ****************************** | | |
| **UNITED FOUNDRY CO., INC.** | : | |
| | : | |
| **Movant** | : | |
| | : | |
| v. | : | Related To Doc. # 35 |
| | : | |
| **JOHNSTOWN INDUSTRIAL** | : | Debtor's Motion To Sell Non- |
| **DEVELOPMENT CORPORATION;** | : | Residential Realty And Tangible |
| **1ST SUMMIT BANK; CITY OF** | : | And Intangible Personalty Free |
| **JOHNSTOWN; REDEVELOPMENT** | : | And Clear Of Liens, Claims, |
| **AUTHORITY OF THE CITY OF** | : | Charges Or Encumbrances Of |
| **JOHNSTOWN; CAMBRIA COUNTY** | : | Third Parties Against Debtor's |
| **TAX CLAIM BUREAU; CAMBRIA** | : | Interest In Same, As Well As |
| **COUNTY; GREATER JOHNSTOWN** | : | For Assumption And Assignment |
| **AREA SCHOOL DISTRICT;** | : | Of Contract For Curtailment Of |
| **INTERNAL REVENUE SERVICE;** | : | Electrical Services; and |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, DEPARTMENT OF** | : | Pennsylvania Electric Company's |
| **LABOR AND INDUSTRY;** | : | ("Penelec") Objection Thereto |
| **PENNSYLVANIA INDUSTRIAL** | : | |
| **DEVELOPMENT AUTHORITY;** | : | |
| **JOHNSTOWN AREA REGIONAL** | : | |
| **INDUSTRIES; and PENNSYLVANIA** | : | |
| **ELECTRIC COMPANY,** | : | |
| | : | |
| **Respondents** | : | |

**<u>MEMORANDUM OPINION</u>**

Debtor United Foundry has brought a motion to assume and assign to another entity an executory contract for curtailable electric service with Pennsylvania Electric Company ("Penelec") that was in effect when debtor's bankruptcy commenced.

Penelec has objected to the motion. It asserts that the contract in question lies within the scope of § 365(c)(1) of the Bankruptcy Code and therefore cannot be assumed and assigned without its consent, which it has not given.

Debtor's motion will be granted over the objection of Penelec for reasons set forth below.

## FACTS

Debtor was in the business of manufacturing custom-designed industrial equipment. It used induction furnaces in its manufacturing process which consumed substantial quantities of electric power.

Penelec generated as well as supplied electric power to customers until some time in the latter half of the 1990s, when it ceased generating electric power and became only a supplier of electric power generated by third parties. Penelec is a public utility and as such is subject to regulation by the Pennsylvania Public Utility Commission ("PUC").

Debtor submitted a document to Penelec captioned "Application For Curtailable Service" on May 3, 1991. Curtailable services programs originated when Penelec was a generator as well as a supplier of electric power. They were designed to defer or eliminate construction of costly new generation plants by decreasing the demand of end-users for electric power. In return for agreeing to curtailment of its electricity at specified times of peak demand over the electric grid as a whole, the customer received a credit on its bill for electricity. This theoretically reduced the cost of generating electricity and resulted in lower rates for customers.

Paragraph 1 of the application stated that debtor was applying for curtailable service:

> ... in accordance with and under the provisions of Penelec's applicable schedule and the rules and regulations of its filed Tariff presently in effect and as the same may be amended, filed and in effect hereafter from time to time with the Pennsylvania Public Utility Commission ("Tariff").

Paragraphs 2 of the application provided that the application constituted a contract between the applicant and Penelec "when accepted by Penelec". Paragraph 3 provided that the term of the contract "shall continue in effect until terminated by Applicant". Penelec accepted the contract when its designated agents affixed their signatures thereto on May 6, 1991, and May 10, 1991, respectively.

Paragraph 7 of the application submitted by debtor provided as follows:

> This Contract shall be binding upon the parties hereto and their respective heirs, executors, administrators and assigns, as the case may be; provided, however, Applicant shall not assign this Contract without first receiving Penelec's written consent, which shall not be unreasonably withheld.

Seeking more favorable rates, debtor terminated the 1991 contract with Penelec on February 25, 2000, and contracted with another supplier of electric power. Debtor had no contract for curtailable service with Penelec until June of 2001, when it again approached Penelec and requested that Penelec provide it with curtailable electric service and Penelec accepted its application.

On May 29, 2001, debtor submitted a document to Penelec captioned "Contract for Reactivation of Curtailable Service". Paragraphs 1, 2 and 7 of the application were

identical to paragraphs 1, 2 and 7 of the 1991 contract. Penelec approved the application on June 12, 2001.

On August 15, 2004, after debtor had hired a new president, it submitted yet another application to Penelec captioned "Contract for Reactivation of Curtailable Service". The provisions set forth in the application were identical in all relevant respects to the application it submitted in May of 2001. Penelec approved the application on September 28, 2004.

As was the case for the contract entered into in June of 2001, the contract entered into in September of 2004 was subject to Rule 20 of the tariffs mentioned in paragraph 1 of the agreement. Tariff 20 provided in part as follows:

> The availability of this Rule 20. [sic] to Customers has been restricted since March 25, 1994. The availability of this Rule 20. [sic] shall be restricted as of January 1, 1999 to existing Full Service Curtailable Customers at existing service locations at existing Curtailable load levels
> ....

Debtor filed a voluntary chapter 11 petition on October 15, 2005, and thereafter continued to operate its business as a debtor-in-possession. Penelec was listed on the schedules as having an unsecured non-priority claim.

Penelec continued providing curtailable electric service to debtor after the commencement of this bankruptcy case in accordance with the terms of the contract entered into in September of 2004. At no time did it object to debtor's entitlement to continue receiving curtailable service in accordance with those terms.

Debtor brought a motion on April 17, 2006, to sell its real and personal property free and clear of all liens and encumbrances and to assume and assign the 2004 contract for curtailable service to the purchaser.

Penelec did not object to the sale of debtor's real and personal property. It did, however, object to the proposed assumption and assignment of the 2004 contract for curtailable service to the proposed purchaser. Penelec, which did not consent to the assumption and assignment, asserted that it was "excused" by applicable law, in this instance Tariff 20, from rendering performance to the purchaser pursuant to the 2004 contract it had with debtor for curtailable service.

A modified order approving a sale of debtor's real and personal property to UF Acquisition issued on May 11, 2006, and was entered on the record the following day. Determination of Penelec's objection to debtor's assumption of the 2004 contract for curtailable service and its assignment to UF Acquisition was deferred until a later time

Pending determination of Penelec's objection, UF Acquisition was directed to pay the rate charged by Penelec for non-curtailable service that was in effect at that time. Should the contract be assumable and assignable, the order further provided, Penelec would refund to UF Acquisition the difference between the rate for curtailable as provided for in 2004 contract and the rate for non-curtailable service. Counsel to debtor and counsel to Penelec consented to the order as modified.

Debtor and Penelec subsequently stipulated to the salient facts and have submitted briefs in support of their respective positions. The matter is now ready for decision.

## ANALYSIS

Penelec objects on two grounds to debtor's motion to assume and then assign its curtailable service contract to UF Acquisition. We shall address the objections *seriatim*.

### *- I -*

### *Does This Court Have Jurisdiction Over This Matter?*

Paragraph 1 of the 2004 contract, we have noted, stated that curtailable service would be provided:

> ... in accordance with and under the provisions of Penelec's applicable rate schedule and the rules and regulations of its filed Tariffs and as the same may be amended, filed and in effect hereafter from time to time with the Pennsylvania Public Utility Commission (("Tariff").

Rule 20 of Penelec's tariffs, in effect at all relevant times, provided that curtailable service:

> ... shall be restricted as of January 1, 1999, to existing Full Service Curtailable Customers at existing service locations at existing Curtailable load levels except during the conditions stated in this Rule....

Penelec asserts that this court "lacks jurisdiction" to determine whether the above curtailable service contract may be assumed and then assigned to UF Acquisition. The proposed transfer of the contract, Penelec continues, "implicates" a rate issue, which under the doctrine of primary jurisdiction should be decided by the PUC. We take Penelec to mean by this that we should abstain from deciding whether the contract may be assumed and assigned to UF Acquisition and instead refer the matter to PUC for decision.

The principle of primary jurisdiction is a judge-made rule. It applies to claims that are "originally cognizable" in a court and comes into play when enforcement of a claim

requires resolution of issues which, under a regulatory scheme, have been placed within the "special competence" of an administrative agency. *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1103 (3d Cir. 1995), *cert. denied*, 519 U.S. 815, 117 S.Ct. 64, 136 L.Ed.2d 25 (1996).

This principle was devised to coordinate the roles played by courts and administrative agencies. In essence, it creates a workable relationship between courts and agencies whereby, in appropriate situations, a court can have the benefit of an agency's views on a matter within the agency's expertise. *Elkin v. Bell Telephone Co. of Pennsylvania*, 491 Pa. 123, 131-32, 420 A.2d 371, 376 (1980).

Primary jurisdiction is more than a "polite gesture of deference" by a court to an agency whose decision the court is free to disregard if it so chooses. To the contrary, the agency's decision is binding on the court and the parties and is subject only to appellate review through appropriate channels; it is not subject to collateral attack. *Elkin*, 491 Pa. at 133, 420 A.2d at 376. Once the administrative agency has spoken on an issue lying within its jurisdiction, the court proceeding that was stayed may resume, guided by the outcome of that determination. *Elkin*, 491 Pa. at 133-34, 420 A.2d at 377.

A court may refer a matter for determination by an administrative agency under the principle of primary jurisdiction if and only if the subject matter: (1) lies within the agency's jurisdiction; and (2) is complex and requires special competence which a court would not or could not be expected to have. *MCI Telecommunications*, 71 F.3d at 1104.

A court should not, however, be "too hasty" in referring a matter to an administrative agency or to develop a "dependence" on an agency when the matter only

remotely involves an issue lying within the domain of the agency's expertise. "Expertise" is not a talisman and does not thereby dissolve a court's jurisdiction. *Elkin*, 491 Pa. at 134, 420 A.2d at 372.

Applying these precepts to the specifics of this case, we conclude that Penelec's argument concerning primary jurisdiction lacks merit. We are not constrained to refer the question concerning assumption and assignment of the above curtailable service contract to the PUC and to defer deciding the present motion until the PUC rules.

Were debtor not in bankruptcy, the PUC undoubtedly would have jurisdiction over a dispute between debtor and Penelec concerning the assumption and assignment of the above contract. Pennsylvania law requires public utilities to file tariffs with the PUC. 66 Pa. C.S.A. § 1302 (Purdon's 2000). These tariffs have the force of law and are binding and dispositive of the rights and liabilities of the customer and the public utility. 66 Pa. C.S.A. § 1303 (Purdon's 2000); also *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission*, 663 A.2d 281, 284 (Pa. Cmwlth. 1995). The PUC has enforcement power with respect to tariffs. 66 Pa. C.S.A. § 501(a) (Purdon's 2000). Finally, matters pertaining to tariffs lie within the expertise of the PUC. *MCI Telecomunications*, 71 F.3d at 1104.

The determination that the issue before this court lies within the competence of the PUC does not warrant the conclusion that we must abstain from deciding the question whether the debtor may assume the above contract and then assign it to a third party. As was pointed out, we also must determine before deferring to the PUC that the resolving issue before us requires special competence that this court does not and cannot be

expected to possess. *Id.*, 71 F.3d at 1104. Unless we so find, we should not "abdicate" our duty to decide the issue on our own. *Id.*, 71 F.3d at 1104.

Paragraph 1 of the above curtailable service contract states that Penelec will provide curtailable service to debtor in accordance with the tariffs on file with the PUC. Tariff 20 provides that, as of January 1, 1999, curtailable service was restricted to existing curtailable full service customers at existing locations at existing curtailable load levels.

In our estimation, no special competence or expertise which this court does not or would not be expected to have is required to determine whether Tariff 20 prevents debtor from assuming and then assigning the above curtailable service contract to UF Acquisition. The language of Tariff 20 is not abstruse or unclear. One need not be a rocket scientist or a brain surgeon to figure out whether Tariff 20 means what Penelec claims it means. There is no need for this court to sit on its hands and wait for the PUC to say what the implications of Rule 20 are for our case.

Our reasons for rejecting Penelec's assertion that under the principle of primary jurisdiction we should defer to the PUC to decide whether the above contract may be assumed and then assigned to UF Acquisition do not end there.

A determination by the PUC that debtor may not assign the above to UF Acquisition in light of Tariff 20 would not necessarily be dispositive in this bankruptcy case. It would not necessarily follow that debtor may not assign the contract to UF Acquisition *under § 365 of the Bankruptcy Code*. Certain contracts which may not be assigned under Pennsylvania law nonetheless may be assigned under § 365. It is for this court alone, not the PUC, to make such a determination with respect to § 365.

### *- II -*

### *May Debtor Assume And Assign The Above Contract In Accordance With § 365 Of The Bankruptcy Code?*

Section 365 of the Bankruptcy Code Provides in relevant part as follows:

(a) Except as provided ... in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract of the debtor ....
(c) The trustee may not assume and assign any executory contract ... of the debtor, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties, if —
    (1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract ... prohibits or restricts assignment of rights or delegation of duties; and
        (B) such party does not consent to such assumption or assignment....
(f)(1) except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract ..., or in applicable law, that prohibits, restricts, or conditions the assignment of such contract ..., the trustee may assign such contract ... under paragraph (2) of this subsection ....
    (2) The trustee may assign an executory contract ... in accordance with the provisions of this subsection only if –
        (A) the trustee assumes such contract ... in accordance with the provisions of this section; and
        (B) adequate assurance of future performance by the assignee of such contract ... is provided, whether or not there has been a default in such contract ....

11 U.S.C. § 365.

Penelec asserts that even if the principle of primary jurisdiction does not require this court to defer to the PUC to decide this matter, the above contract may not be assumed and assigned in accordance with § 365(c)(1) of the Bankruptcy Code. Applicable non-bankruptcy law, Penelec maintains, excuses it from accepting performance from or

rendering performance to UF Acquisition because it is a different entity than debtor or debtor-in-possession.

Section 365 gives effect to a general policy of favoring assumption and assignment of executory contracts. With certain exceptions, § 365(a) permits a trustee in bankruptcy to assume or reject *any* pre-petition executory contract to which the debtor was a party. Allowing the trustee to do so maximizes the value of the bankruptcy estate by permitting the assumption of executory contracts that are beneficial to the bankruptcy estate and the rejection of those that are not. *L.R.S.C. Co. v. Rickel Home Centers, Inc.* 209 F.3d 291, 298 (3d Cir. 2000), *cert denied*, 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000).[1]

Subsection 365(f)(1) is intended to further support the policy as codified in §365(a) by preventing anti-alienation provisions and the like in an executory contract from hindering the trustee's quest to maximize the value of the bankruptcy estate. *Warnock v. Automotive Groups, Inc. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994).

By its express terms, § 365(f)(1) applies to a specific subset of executory contracts: those for which "applicable law ... prohibits, restricts or conditions the assignment of such contract". The trustee may assume and assign such a contract only if: (1) he or she assumes the contract in accordance with the provisions of § 365; and (2)

---

[1] It is not disputed in this matter that debtor, as debtor-in-possession, also has authority, subject to court approval, to assume and assign executory contracts. As a consequence of § 1107(a) of the Bankruptcy Code, the term "debtor-in-possession" may be substituted for the term "trustee" appearing in § 365. It also is not disputed that the above curtailable service contract is executory.

the assignee of the contract provides adequate assurance of future performance, whether or not the contract is in a default status. 11 U.S.C. § 365(f)(2).[2]

The rule articulated at § 365(f)(1) is subject to the exception found at § 365(c)(1). The first clause of § 365(f)(1) reads as follows: "Except as provided in subsection (c) of this section".

By its terms, subsection 365(c)(1) excuses the non-debtor party to an executory contract from rendering performance to or accepting performance from the would-be assignee when *applicable law* excuses it from doing so with respect to an entity different from the one with which the non-debtor party initially contracted. *RCI Technology Corp. v. Sunterra Corp. (In re Sunterra Corp)*, 361 F.3d 257, 266 (4th Cir. 2004).

The provisions of § 365(f)(1) and § 365(c)(1) might at first glance appear to be in conflict. "What § 365(f)(1) appears to give, § 365(c)(1) seems to take away". *Worthington v. General Motors Corporation* (*In re Claremont Acquisition Corp.*), 113 F.3d 1029, 1032 (9th Cir. 1997). An apparent inconsistency seems to arise from use of the term "applicable law" in each of these subsections. Whereas § 365(c)(1) bars assignment of an executory contract, § 365(f)(1) permits assignment notwithstanding any contrary provision in applicable law. Subsection 365(c)(1) would seem to render § 365(f)(1) otiose. *Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc)*, 165 F.3d 747, 751 (9th Cir. 1999), *cert. denied*, 528 U.S. 924, 120 S.Ct. 369, 145 L.Ed.2d 248 (1999).

---

[2] The parties have stipulated that if the above contract may be assumed and assigned, UF Acquisition will cure any default that has occurred with respect to the contract. *See* 11 U.S.C. § 365(b)(1).

This inconsistency is illusory rather than real. The term "applicable law" in these respective subsections is "markedly different in scope". *Rieser v. Dayton Country Club (In re Magness)*, 972 F.2d 689, 695 (6th Cir. 1992). Understanding this difference is crucial to determining whether debtor may assign the above curtailable service contract to UF Acquisition.

Subsection 365(f)(1) sets forth a broad rule that overrides any general law prohibiting, restricting or conditioning assignment of an executory contract; it creates a "carefully crafted exception" to such general laws, which are ineffective against a trustee in bankruptcy.

The term "applicable law" used in § 365(c)(1) encompasses a different subset of laws from those encompassed by § 365(f)(1). Whereas § 365(f)(1) encompasses laws that impose a general *prohibition* on assignment of an executory contract, § 365(c)(1) encompasses laws that e*xcuse* the non-debtor party to the executory contract from accepting performance from or rendering performance to an entity other than the debtor or the debtor-in-possession. Applicable laws of the sort encompassed by § 365(c)(1) prevail over applicable laws encompassed by § 365(f)(1). *In re Catapult Entertainment*, 165 F.3d at 752; also *City of Jamestown, Tennessee v. James Cable Partners (In re James Cable Partners)*, 27 F.3d 534, 538 (11th Cir. 1994).

When determining whether § 365(c)(1) trumps § 365(f)(1) in a given instance one must determine *why* an "applicable law" precludes assignment of the contract. Subsection 365(c)(1) comes into play only when the "applicable law" in question precludes assignment on the rationale that the *identity* of the party to the initial contract other than

the non-debtor party was *material* to the contract. *In re Sunterra Corp.*, 361 F. 3d at 266-67; also *In re Catapult Entertainment*, 165 F.3d at 752. If the identity of the party with whom the non-debtor contracted – in this instance, debtor –  was not material to formation of that contract, § 365(c)(1) does not apply.

Subsection 365(f)(1) is not operative in this case. Penelec has not called our attention to any general law that prohibits, restricts or conditions debtor's assigning the above contract to a third party such as UF Acquisition. It follows straightaway from this that debtor may assume and assign the above curtailable service contract to UF Acquisition in accordance with § 365(a) *unless* § 365(c)(1) applies. We previously noted that § 365(c)(1), if applicable, constitutes an exception to § 365(a).

Penelec asserts that § 365(c)(1) applies here and therefore overrides § 365(a). As support for this assertion, Penelec points to Tariff 20, *supra*.

A tariff such as Tariff 20 has the force of law and is binding on the customer as well as the utility company. *Philadelphia Water Co. v. Pennsylvania Public Utility Commission*, 808 A.2d 1044, 1050 (Pa. Cmwlth. 2002) (citing *Pennsylvania Electric Co.*, 663 A.2d at 284).

According to Penelec, Tariff 20 is the sort of "applicable law" encompassed by § 365(c)(1). UF Acquisition was not, as of January 1, 1999, an *existing* customer of Penelec at the *existing* service location at *existing* curtailable load levels. UF Acquisition did not even exist as of January 1, 1999; it did not come into existence until several years thereafter.

Penelec maintains that debtor may not assign the above curtailable service to UF Acquisition because the identity of the party with whom it initially contracted – i.e., debtor – was material to formation of that contract. As an indication of the materiality of the identity of that party to formation of the contract, Penelec points to the restriction in Tariff 20 limiting curtailable service to existing customers as of January 1, 1999, at an existing location and at an existing load level. Had debtor not been an existing customer of Penelec at that time at the same service location and at the then-existing load level, Penelec claims, it would not have entered into the curtailable service contract that debtor now seeks to assign to UF Acquisition.

This assertion is without merit. Penelec's reliance on Tariff 20 in support of its position is misplaced.

The facts to which debtor and Penelec have stipulated lead us to conclude that the identity of debtor, as characterized by Tariff 20, was *not* material to formation of the contract debtor now seeks to assume and assign to UF Acquisition. We base our conclusion on Penelec's past conduct vis-à-vis debtor.

Debtor initially entered into a curtailable service contract with Penelec in May of 1991, when Penelec approved debtor's first application for such service. Said contract was entered into prior to January 1, 1999, the date on which Tariff 20 cut off a new customer's eligibility for curtailable service. It remained in effect until February 25, 2000, when debtor decided to look elsewhere for a more favorable rate for curtailable service.

Debtor was without a contract for curtailable service from Penelec for approximately fifteen months. On May 29, 2001, however, debtor submitted a document

to Penelec entitled "Contract for Reactivation of Curtailable Service". Penelec accepted the document on June 12, 2001, approximately twenty-five months *after* the January 1, 1999 deadline for qualifying for curtailable service from Penelec.

If we apply Tariff 20 as Penelec would have us do, debtor did *not* qualify for curtailable service when it again began receiving curtailable service from Penelec in June of 2001. Debtor at that time was *not* an *existing* full service customer at an *existing* service location at a then-*existing* load level.

Penelec's decision to reactive curtailable service to debtor in June of 2001 in spite of this restriction leads us to conclude that debtor's identity as an existing curtailable service customer at an existing service location at an existing load level was *not* material to the contract for curtailable service entered into at that time. Were debtor's identity as such a customer truly material to a formation of a contract for curtailable service, we would expect Penelec to have rejected rather than accepted debtor's request for reactivation of curtailable service.

The fact that debtor submitted another application for reactivation of curtailable service in August of 2004 which Penelec approved in September of 2004 does not alter this conclusion. This latter contract, which is the contract debtor presently seeks to assign and assign to UF Acquisition, is nothing more than a reaffirmation of the curtailable service contract debtor and Penelec entered into in June of 2001. The 2001 contract had not run its course. Paragraph 3 of the contract provided that it would remain in effect until terminated "in accordance with the Tariff" by debtor or Penelec.

The September 2004 contract was entered into after debtor installed a new president. The necessity for doing this is not apparent from the record. We can find nothing in the language of the curtailable service contract entered into in June of 2001 which *ipso facto* terminated it if debtor installed a new president.

Contrary to what Penelec asserts, we conclude in light of the foregoing that debtor's identity was not material to Penelec's decision to contract with debtor in June of 2001 for curtailable service. To find that debtor's identity was material for purposes of § 365(c)(1) in light of Tariff 20 would require us to run roughshod over the language of the tariff.

It in turn follows from this conclusion that the exception to assumption and assignment of an executory contract found at § 365(c)(1) does not apply here and does prevent debtor from assuming and assigning the curtailable service contract that was in effect when debtor filed its bankruptcy petition. Subsection 365(c)(1) does not override § 365(a) in this instance. Debtor may, in short, assume the contract and assign it to UF Acquisition in accordance with § 365(a) of the Bankruptcy Code.

An appropriate order shall issue.

          /s/
          BERNARD MARKOVITZ
          U.S. Bankruptcy Judge

Dated: November 2, 2006

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **UNITED FOUNDRY CO., INC.,** | : | Bankruptcy No. 05-73035 BM |
| | : | |
| | : | |
| **Debtor** | : | Chapter 11 |
| ****************************** | | |
| **UNITED FOUNDRY CO., INC.** | : | |
| | : | |
| **Movant** | : | |
| | : | |
| v. | : | Related To Doc. # 35 |
| | : | |
| **JOHNSTOWN INDUSTRIAL DEVELOPMENT CORPORATION; 1ST SUMMIT BANK; CITY OF JOHNSTOWN; REDEVELOPMENT AUTHORITY OF THE CITY OF JOHNSTOWN; CAMBRIA COUNTY TAX CLAIM BUREAU; CAMBRIA COUNTY; GREATER JOHNSTOWN AREA SCHOOL DISTRICT; INTERNAL REVENUE SERVICE; COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF LABOR AND INDUSTRY; PENNSYLVANIA INDUSTRIAL DEVELOPMENT AUTHORITY; JOHNSTOWN AREA REGIONAL INDUSTRIES; and PENNSYLVANIA ELECTRIC COMPANY,** | : : : : : : : : : : : : : : : : : : | |
| | : | |
| **Respondents** | : | |

## **ORDER OF COURT**

**AND NOW**, this **2nd** day of **November**, 2006, for reasons set forth in the foregoing memorandum opinion, it hereby is **ORDERED**, **ADJUDGED** and **DECREED** that

debtor's motion to assume and assign its contract with Pennsylvania Electric Company for curtailable electric service be and hereby is **GRANTED**.  The objection by Pennsylvania Electric Company to debtor's motion be and hereby is **OVERRULED**.

 It is **SO ORDERED**.


                  **/s/**
               **BERNARD MARKOVITZ**
               U.S. Bankruptcy Judge


cm: James R. Walsh, Esq.
   John P. Vesica Jr., Esq.
   Russell R. Johnson, III, Esq.
   Norma Hildenbrand, Esq. o/b/p United States Trustee